# In the United States Court of Federal Claims

No. 03-2221C
Filed: December 29, 2006
**TO BE PUBLISHED**

| | |
|---|---|
| ST. CHRISTOPHER ASSOCIATES, L.P., | Breach of Contract; |
| Plaintiff, | Motion to Dismiss, RCFC 12(b)(1), (b)(6); |
| v. | National Housing Act, 12 U.S.C. § 1715z-1, as amended; |
| THE UNITED STATES, | Statute of Limitations, 28 U.S.C. § 2501; |
| Defendant. | Summary Judgment, RCFC 56(c); |
| | Tucker Act, 28 U.S.C. § 1491; |
| | U.S. CONST. amend. V; |
| | 24 C.F.R. § 235.55(a) (1995) (saved by § 236.1(b) (1997)); |
| | 24 C.F.R. § 245.325(b). |

**Harry J. Kelly,** Nixon Peabody, LLP**,** Washington, D.C., counsel for plaintiff.

**Sheryl Floyd**, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., counsel for defendant.

**MEMORANDUM OPINION AND FINAL ORDER**

**BRADEN, Judge.**

## I. RELEVANT FACTS[1]

St. Christopher Apartments, Inc. is a 100-unit multifamily apartment project for elderly persons, located in Hartford, Connecticut ("Property"). On June 3, 1971, the original owner of the

[1] The relevant facts recited herein were derived from: the September 24, 2003 Complaint ("Compl."); the Defendant ("Government")'s April 19, 2006 Motion to Dismiss or, in the Alternative for Summary Judgment ("Gov't Mot."), Appendix ("Gov't App."), and Proposed Findings of Uncontroverted Facts ("Gov't Fact"); Plaintiff's May 30, 2006 Response thereto and Cross-Motion for Partial Summary Judgment ("Pl. Resp.") and Appendix ("Pl. App."); Plaintiff's May 30, 2006 Response to Defendant's Proposed Findings of Uncontroverted Facts ("Pl. Fact Resp."); Plaintiff's May 30, 2006 Findings of Uncontroverted Fact ("Pl. Fact"); the Government's June 30, 2006 Reply to Plaintiff's May 30, 2006 Response and Response to Plaintiff's May 30, 2006 Cross-Motion for Partial Summary Judgment ("Gov't Reply"); the Government's June 30 2006 Response to Plaintiff's May 30, 2006 Findings ("Gov't Fact Resp."); and Plaintiff's July 25, 2006 Reply to Defendant's June 30, 2006 Response ("Pl. Reply").

Property received a mortgage from the Connecticut Bank ("Bank") in the amount of $2,391,000 to finance the purchase and construction at the Property site. The mortgage was issued under Section 236 of the National Housing Act, 12 U.S.C. § 1715z-1, as amended, that affords 40-year loans at market rates, with a subsidy allowing owners effectively to pay only a 1% rate amortized over 40 years. *See* Def. App. at 7. In return, the property owners are required to pass the benefits of the federally-assisted loans to tenants by charging lower rents. *Id.* The Department of Housing and Urban Development ("HUD") provided mortgage insurance to the Bank and entered into a Regulatory Agreement with the original owner. *Id.* In 1983, however, the original owner defaulted, causing the Bank to assign the mortgage to HUD. *See* Def. App. at 7; Pl. App. at 53.

The Finch Group formed St. Christopher Associates Limited Partnership ("Plaintiff") to acquire the Property and assume the debts of the prior owner. *See* Compl. ¶ 12. On December 2, 1983, the Finch Group responded to HUD's attempt to locate a new buyer for the Property and submitted a "proposal for the restructuring of debt and equity of St. Christopher Apartments." *See* Pl. App. at 22. On December 19, 1984, Plaintiff and HUD executed a Provisional Workout Arrangement ("PWA") to structure how Plaintiff would make mortgage and interest arrears payments. *See* Pl. App. at 51-52; Gov't App. 11-13

Paragraph 3(a) of the PWA provided:

> Commencing in the month following Preliminary TPA [Transfer of Physical Assets] Approval, a monthly payment of $16,627.75, which represents the Level Annuity Monthly Payment (LAMP) required to amortize the outstanding principal balance of $2,375, 398, over a new 40-year term effective in the month following Preliminary TPA Approval at the per annum interest rate of seven and one-half (7½) percent, after application of the monthly interest reduction payment of $10,604.00. Notwithstanding the mortgage modification, the entire balance outstanding on the Note and Mortgage shall be due and payable on May 1, 2012, the expiration date of the original mortgage term. The mortgage modification shall be in form suitable for recording.

*Id.*

Paragraph 3(b) of the PWA provided:

> In addition, the following supplemental payments shall be made to reduce mortgage interest arrears from limited partner investor capital contributions in accordance with the following schedule:

| Date | Amount |
|---|---|
| Preliminary Approval of TPA (Pursuant to 2(b) above) | $220,000 |
| First anniversary of TPA Approval | 80,000 |
| Second anniversary of TPA Approval | 92,000 |
| Third anniversary of TPA Approval | 92,000 |
| Fourth anniversary of TPA Approval | 92,000 |
| Fifth anniversary of TPA Approval | 90,749 |
| Sixth anniversary of TPA Approval | 100,000 |
| Total | $766,749 |

*Id.*

On October 1, 1984, prior to the execution of the PWA and closing, HUD approved Plaintiff's request for a rent increase on the Property, based upon "the cost of electricity, reserve for replacements and operational expenses." Def. App. at 14. On December 28, 1984, HUD and Plaintiff executed a Regulatory Agreement, pursuant to Section 236, an Agreement For Modification of Note and Mortgage, incorporating the terms of the PWA, and closing documents. *See* Gov't App. at 1-10; *see also* Pl. App. at 15-20 and 53-56.

Shortly thereafter, HUD misapplied PWA payments received from the Finch Group. *See* Pl. App. at 62 (July 16, 1985 letter from the Finch Group to HUD requesting a review of billings from May, June, and July of 1985); *see also id.* at 66 (Jan. 29, 1986 letter from the Finch Group to HUD reporting: "In reviewing our records we noted that this [August 1, 1985] check was not applied by HUD as a payment in accordance with the workout."); *see also id.* at 71 (May 2, 1986 letter from the Finch Group to Director of HUD's Housing Management Division in Hartford, Connecticut again reporting: "A review of the April 18th HUD mortgage account statement and previous month's statements indicates that monthly contributions to the replacement reserve escrow on this project have apparently been applied against mortgage interest."); *see also id.* at 79-82 (Plaintiff's analysis of mortgage billings concluding that "the primary problem with the St. Christopher's mortgage statement is that the billing adjustments were not made retroactively to the amounts agreed to, and the effective dates of, the Agreements").

On June 14, 1985, the Chief of HUD's Loan Management Branch sent a memorandum, warning her superiors that HUD's accounting practices were the cause of misapplication of the Plaintiff's mortgage payments:

> OFA could handle [the payment terms contained in the Agreement] if it were not for the fact that the interest has not been capitalized into a second, nor has it been recast into the first so it will "hang out there" absorbing all collections and causing additional interest to accrue – with no provision, once again, for how this is to be handled.

Pl. App. at 75.

On June 16 1986, however, HUD sent Plaintiff a letter advising that the misapplication could not be corrected retroactively:

> In accordance with the Modification Agreement signed by HUD on November 1, 1984, indicating that monthly payments must be made to the Reserve for Replacement Account, we concur with your payment of the monthly Replacement Reserve of $1,762 into an escrow account at Fleet National Bank. However, we are unable to retroactively adjust your delinquent mortgage interest and Reserve for Replacement balances, since doing so would not be in conformance with present Office of Finance and Accounting Procedures and Regulations.

Pl. App. at 74. HUD staff continued efforts to have the errors corrected, without success. *See* Pl. App. at 656-58, 755.

On December 23, 1985, Plaintiff made an $80,000 payment for mortgage interest arrears, pursuant to the PWA. *See* Gov't App. at 72. On December 28, 1986, Plaintiff also made a $92,000 payment for mortgage interest arrears, pursuant to the PWA. *Id.* at 73. Plaintiff, however, did not make the payment due on December 28, 1987 or thereafter because Plaintiff was unable to syndicate the investor limited partnership units and, as a result, no limited partner investor capital contributions were made after 1986. *See* Pl. App. at 51, 568; *see also* Gov't App. at 11, 95 (Dec. 21, 1989 letter from HUD to Plaintiff denying a rent increase and noting the "non-payment or your required yearly workout payment of $92,000").

On November 2, 1987, the Director of Regional Operations for the Finch Group sent a letter to HUD proposing a three-step solution to improve the Property's "cash position," while minimizing the "negative impact" on "affordability for residents." Gov't App. at 74-76. This proposal included a rent increase and additional Section 8 rental assistance. *Id.*

On January 25, 1988, Plaintiff submitted a first rent increase request. *See* Pl. App. at 108 (letter from Plaintiff to HUD advising, "At your request, I am not submitting a full-blown rent increase package[.]").

On March 9, 1988, Plaintiff sent a letter advising HUD that Plaintiff was in litigation with Carabetta Enterprises ("Carabetta") regarding "certain unspecified rights and expectations that Carabetta claims to have had to purchase St. Christopher Apartments." Gov't App. at 88-89. The letter advised HUD that a jury verdict was rendered against the Plaintiff in the amount of $201,000 and if Plaintiff was not successful on appeal, "it is fairly clear that the economics of continued ownership disintegrate at that point." *Id.* at 88. The letter also stated that, despite the uncertainty surrounding the litigation, the Property "needs a rent increase, and it needs additional Section 8." *Id.* at 89.

On March 27, 1988 HUD and Plaintiff met to discuss the rent increase, possible Section 8 Loan Management Set-Aside ("LSMA") units, and the status of the $92,000 workout payment. On May 9, 1988 HUD issued a memorandum stating: "At the present time, our computations indicate that a rent increase is not justified . . . [but St. Christopher Associates, L.P.] may submit updated information to support the rent increase." Gov't App. at 90.

On July 20, 1988, Plaintiff sent HUD a letter advising that, "the parties to the litigation have agreed to a transfer of ownership and management of the property" and "Carabetta will soon be making a formal application for a Transfer of Physical Assets (TPA)." Gov't App. at 91-92.

On November 1, 1988, Plaintiff re-posted a notice of a rent increase request for tenant review. *Id.* On December 5, 1988, Plaintiff wrote a second letter requesting that HUD grant the rent increase to commence on January 1, 1989. *Id.* at 125.

On December 5, 1988, the Finch Group informed HUD that Plaintiff had notified tenants of a rent increase on November 1, 1988, but did not submit another rent increase request to HUD, because "[its] original submission still stands." Gov't App. at 93.

On December 21, 1988, HUD denied Plaintiff's rent increase request, because of "the non-payment of your required yearly workout payment of $92,000 which was due on December 28, 1987 to Central Office." Gov't App. at 95. HUD further advised Plaintiff that, pursuant to the Project Insured Servicing Handbook, "'an agreement must be reached between HUD and the owner with respect to any finding of a violation under the mortgage or regulatory agreement before final action is taken on a request rent increase,' [but] no such agreement has been reached." *Id.*

On January 6, 1989, HUD sent Plaintiff a letter stating:

> According to our records, we have not received the annual lump sum payment of $92,000 due on January 1, 1989 under the terms of your workout agreement with HUD. This now makes the total delinquency $184,000 which includes the delinquency from last year.
>
> This office has taken no action regarding the delinquency for January 1, 1988, because we had been advised that you were negotiating a Transfer of Physical Assets (TPA). However, since we have not received a TPA and do not believe submission of one is imminent, we must advise you that if we do not receive the $184,000 or a TPA application within 30 days of the date of this letter, we will seek mortgagee-in-possession status and commence foreclosure proceedings. In addition, we will consider withholding payments on your Loan Management set-aside Section 8 contract and other administrative sanctions.

Gov't App. at 96.

On February 9, 1989, Plaintiff informed HUD that an agreement was reached with Carabetta "over the terms and conditions prefatory to a [TPA] of the property" to be finalized by the end of June 1989, at the earliest. *See* Gov't App. at 97. Accordingly, Plaintiff requested "a temporary suspension of deposits to the local reserve for replacement retroactive to the December 1988 deposit and continuing for the earlier of one year or until final approval of the TPA deposit in order to reduce accounts payable." *Id.* at 98.

On March 2, 1989, HUD denied Plaintiff's request to suspend deposits to the reserve for replacement account, because Plaintiff did not respond to HUD's letter demanding a delinquent payment of $184,000 and HUD had not received a TPA proposal. *See* Gov't App. at 102.

On March 7, 1989, the Manager of HUD's Connecticut office advised HUD's Director of the Office of Multifamily Housing Management in Washington, D.C., that HUD should commence foreclosure proceedings on the Property, because Plaintiff "has not made, and has strongly indicated that they [sic] will not make, the last two workout payments presently due, totalling [sic] 184,000." Gov't App. at 103-04.

On April 3, 1989, HUD sent Carabetta a letter denying the proposed TPA, because it did not include a Certified Physical Inspection and Cost Analysis of needed repairs. *See* Gov't App. at 109.

The record does not reflect what happened between April 3, 1989 and October 21, 1996, when Plaintiff sent HUD another request for a rent increase, a waiver of excess rent payments, and a release from the replacement reserve requirements. *See* Gov't App. at 118-19. On November 6, 1996, HUD requested that Plaintiff submit a plan for complying with the PWA requirements. *Id.* at 120.

On September 25, 1997, the manager for the Property, Housing Solutions, Inc. ("Housing Solutions"), sent a letter to HUD requesting a rent increase. *See* Def. App. at 121-171; *see also id.* at 368-69. The relevant HUD officials, however, claim that they had no knowledge of this request. *See* Gov't App. at 318-19, 332-34, 337-42, 349-52, 359-62.

On February 24, 1998, Housing Solutions sent HUD a letter with an updated 1988 budget and a year-by-year budget comparison to "illustrate the dire need for an overdue and substantial rent increase." Def. App. at 177-78 (letter stating Plaintiff "would greatly appreciate your consideration of our request for a long overdue rent increase").

On April 2, 1998, Plaintiff was informed that HUD was initiating foreclosure proceedings, because the "mortgage on St. Christopher Apts. is in default and sufficient payments are not being made to cure the default." Gov't App. at 180-81.

On January 3, 2001, HUD issued a Notice of Default and Foreclosure. *See* Gov't App. at 188-92; *see also* Pl. App. at 313-16. The grounds for foreclosure were that "a default has been made in the covenants and conditions of the Mortgage in that the payment due on September 1, 1985, was

not timely made and remains wholly unpaid as of the date of this notice, and no payment has been made sufficient to restore the loan to currency." *Id.* at 188, 313. In response, Plaintiff filed a lawsuit in the United States District Court in Connecticut to enjoin the foreclosure sale. *See St. Christopher Assoc., L.P.* v. *Martinez, et al.*, Civil No. 3:01 CV 87 (RNC) (D. Conn. 2001). On January 24, 2001, HUD cancelled the foreclosure sale and withdrew the Notice of Default and Foreclosure. *See* Gov't App. at 192. On June 21, 2001, the parties filed a Stipulation Regarding Withdrawal Without Prejudice. *See* Pl. App. at 1069.

On May 29, 2002, Plaintiff submitted another request for a rent increase to HUD and posted a notice to the tenants. *See* Gov't App. at 193-201. On July 2, 2002, HUD approved the rent increase. *Id.* at 204; *see also* Pl. App. at 327.

On December 9, 2003, Plaintiff requested that HUD approve transfer of ownership of the Property to a new owner. *See* Def. App. at 206. On March 10, 2004, HUD granted preliminary approval of the TPA, on the condition that Plaintiff pay the remaining balance of the arrearages at the time of sale. *Id.* On April 1, 2004 Plaintiff sold the Property and paid HUD $433,990 in mortgage interest arrearages. *Id.* at 209.

## II. PROCEDURAL HISTORY.

On September 24, 2003, Plaintiff filed a Complaint in the United States Court of Federal Claims seeking damages from the United States ("Government"), because of HUD's failure to act upon the Plaintiff's rent increase request, submitted to HUD on September 25, 1997. *See* Compl. ¶ 1. Count One alleges that the Government breached its obligations under statute, regulations, other agency guidance, and the Regulatory Agreement by failing to "establish rents for the Property that allowed it to meet its operating capital maintenance costs, and to consider the rent increase requests from [Plaintiff]," thereby entitling Plaintiff to $1,407,168 in damages, equal to the amount of revenue plus interest that would have been derived from the requested 1997 rent increase. *Id.* ¶¶ 36-39. Count Two alleges that the Government deprived Plaintiff of property without just compensation, in violation of the Fifth Amendment of the United States Constitution, because the Government failed to consider the rent increase request thereby decreasing Plaintiff's "revenue and return from the Property and resulted in deterioration." *Id.* ¶¶ 40-42. Count Two also seeks $1,407,168 in damages. *Id.* ¶ 42.

On January 22, 2004, the Government filed an Answer. On April 1, 2004, Plaintiff and Government filed a Joint Preliminary Status Report. The court held status conferences on April 4, 2005 and July 8, 2005 to establish a briefing schedule.

On April 19, 2006, the Government filed a Motion to Dismiss or, in the Alternative, for Summary Judgment and Proposed Findings of Uncontroverted Facts in support. On May 30, 2006, Plaintiff filed an Opposition and Cross-Motion for Partial Summary Judgment, Proposed Findings of Uncontroverted Facts in support, and a Response to Government's Proposed Findings of Uncontroverted Facts. On June 30, 2006, the Government filed a Reply and Response to Plaintiff's

Response and Cross-Motion. On the same date, the Government filed a Response to Plaintiff's Proposed Findings of Uncontroverted Facts. On July 7, 2006, Plaintiff filed a Reply to the Government's Response to Plaintiff's Cross-Motion. On October 24, 2006 the court convened a status conference, at which time Plaintiff requested oral argument. On December 8, 2006, the court held oral argument on the parties' pending motions.

## III. DISCUSSION.

### A. Jurisdiction.

Pursuant to the Tucker Act, the United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States* v. *Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States* v. *Testan*, 424 U.S. 392, 398 (1976)). Therefore, in order to come within the jurisdictional reach of the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Roth* v. *United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) ("Because the Tucker Act itself does not provide a substantive cause of action, . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit."); *Kahn* v. *United States,* 201 F.3d 1375, 1378 (Fed. Cir. 2000) ("[T]he plaintiff 'must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.'" (quoting *James* v. *Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998)).

Therefore, a plaintiff must demonstrate that the source of substantive law upon which the claim relies "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *United States* v. *Mitchell*, 463 U.S. 206, 216 (1983); *see also Testan*, 424 U.S. at 400.[2] In the "parlance of the Tucker Act cases, that source must be 'money-mandating.'" *Id.*

---

[2] In considering the money-mandating requirement of the Tucker Act, the United States Supreme Court has held that: "This 'fair interpretation' rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity . . . . It is enough, then, that a statute creating a Tucker Act right be *reasonably amenable* to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be 'lightly inferred' . . . a *fair inference* will do." *United States* v. *White Mountain Apache Tribe*, 537 U.S. 465, 472-73 (2003) (citations omitted). The United States Court of Appeals for the Federal Circuit has recognized, but not resolved, that the United States Supreme Court, in restating the money-mandating test, may have

Under the Tucker Act, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. A claim accrues "'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'" *Brown Park Estates-Fairfield Dev. Co.* v. *United States*, 127 F.3d 1449, 1455 (Fed. Cir. 1997) (quoting *Brighton Village Assocs*. v. *United States*, 52 F.3d 1056, 1060 (Fed. Cir. 1995)).

**B. Relevant Standards Of Review.**

**1. Motion to Dismiss - - RCFC 12(b)(1).**

A challenge to the "court's general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion." *Palmer* v. *United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(1). In deciding a motion to dismiss, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke* v. *United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). Plaintiff, as the nonmoving party, however, bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds* v. *Army & Air Force Exch. Serv*., 846 F.2d 746, 748 (Fed. Cir. 1988) ("Once the [trial] court's subject matter jurisdiction [is] put in question, it [is] incumbent upon [plaintiff] to come forward with evidence establishing the court's jurisdiction.").

**2. Motion to Dismiss - - RCFC 12(b)(6).**

Dismissal of a complaint under RCFC 12(b)(6) is appropriate only "when the plaintiff can prove no set of facts that would warrant the requested relief, when drawing all well-pleaded factual inferences in favor of the complainant." *Levine* v. *United States*, 453 F.3d 1348, 1350 (Fed. Cir. 2006) (citing *Leider* v. *United States*, 301 F.3d 1290, 1295 (Fed. Cir. 2002)); *see also Ainslie* v. *United States*, 355 F.3d 1371, 1373 (Fed. Cir. 2004) (a Rule 12(b)(6) dismissal is "appropriate when the facts as asserted do not entitle the claimant to a legal remedy"); RCFC 12(b)(6).

**3. Summary Judgment - - RCFC 56(c).**

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *See Moden* v. *United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005) ("Summary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."); *see also* RCFC 56(c).

---

made it less stringent. *See Fisher* v. *United States*, 402 F.3d 1167, 1173-74 (quoting *White Mountain*, 537 U.S. 465). For the purposes of this case, under either interpretation, the court does not have jurisdiction over the portions of Count One of the Complaint discussed herein.

Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Therefore, to avoid summary judgment, the nonmoving party must put forth evidence sufficient for a reasonable factfinder to return a verdict for that party. *Id.* at 248-50 (citations omitted).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986) (holding the moving party must meet its burden "by 'showing' – that is pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."); *see also Riley & Ephriam Constr. Co., Inc.*, 408 F.3d 1369, 1371 (Fed. Cir. 2005) ("The moving party bears the burden of demonstrating the absence of a genuine issue of material fact."). Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the nonmoving party to show the existence of a genuine issue for trial. *See Novartis Corp.* v. *Ben Venue Laboratories*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial.").

A trial court is required to resolve all doubt over factual issues in favor of the nonmoving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1987). And, all reasonable inferences and presumptions must be resolved in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255; *see also Moden*, 404 F.3d at 1342 ("[A]ll justifiable inferences [are drawn] in favor of the party opposing summary judgment.").

The fact that both parties have moved for summary judgment does not relieve the trial court of its responsibility to determine the appropriateness of summary disposition. *See Stratos Mobile Networks U.S.A., L.L.C.* v. *United States*, 213 F.3d 1375, 1379 (Fed. Cir. 2000) (quoting *Prineville Sawmill Co., Inc.* v. *United States*, 859 F.2d 905, 911 (Fed. Cir. 1988)) ("[The court] determines for itself whether the standards for summary judgment have been met."). Summary judgment will not necessarily be granted to one party or another when both parties have filed motions. *See California* v. *United States*, 271 F.3d 1377, 1380 (Fed. Cir. 2001) ("The mere fact that the parties have cross-moved for summary judgment does not impel a grant of at least one motion[.]"). The court must evaluate each party's motion on its own merits. *Id.*

Contract interpretation "is a matter of law and thus amenable to decision on summary judgment." *Gov't Sys. Advisors, Inc.* v. *United States*, 847 F.2d 811, 812, n.11 (Fed. Cir. 1988), *accord L.W. Matteson, Inc.* v. *United States*, 61 Fed. Cl. 296, 307 (2004) (Contract interpretation is "an appropriate predicate for summary judgment.").

**C. The Court's Resolution Of Government's Motion To Dismiss.**

**1. Neither Section 236 Of The National Housing Act, Applicable Regulations, Nor Agency Guidance Authorize A Claim For Money Damages Against the Government.**

In this case, the Complaint alleges that HUD breached: Paragraphs 4(a) and 4(1) of the Regulatory Agreement; Section 236 of the National Housing Act, 12 U.S.C. § 1715z-1, as amended;[3]

---

[3] Section 236 of the National Housing Act, in relevant part, provides:

(1)(A)(I) For each dwelling unit there shall be established, with the approval of the Secretary, a basic rental charge and fair market rental charge.

(ii) The basic rental charge shall be
(I) the amount needed to operate the project with payments of principal and interest due under a mortgage bearing interest at the rate of 1 percent per annum; or
(II) an amount greater than that determined under clause (ii)(I), but not greater than the market rent for a comparable unassisted unit, reduced by the value of the interest reduction payments subsidy.

(iii) The fair market rental charge shall be
(I) the amount needed to operate the project with payments of principal, interest, and mortgage insurance premium which the mortgagor is obligated to pay under the mortgage covering the project; or
(II) an amount greater than that determined under clause (iii)(I), but not greater than the market rent for a comparable unassisted unit.

12 U.S.C. § 1715z-1(1)(A).

24 C.F.R. § 236.55(a)(1995) (saved by 236.1(b)(1997));[4] 24 C.F.R. § 245.325(b);[5] and HUD Handbook 4350.1, REV-1 at 7-1,[6] 7-21,[7] 7-25.[8] *See* Compl. ¶¶ 14, 15, 16, 17, 33, 37.

---

[4] 24 C.F.R. § 236.55(a) provides:

> Approved rental charge. The [Federal Housing] Commissioner will establish, and the mortgagor will maintain, a Basic Rent and Market Rent for each dwelling unit.

24 C.F.R. § 236.55(a) (1995) (saved by § 236.1(b) (1997)).

[5] 24 C.F.R. § 245.325 provides:

> (a)When processing a request for an increase in maximum permissible rents, HUD shall take into consideration reasonably anticipated increases in project operating costs that will occur (1) within 12 months of the date of submission of materials to HUD under § 245.315(a) (profit and loss approach) or (2) within 12 months of the anticipated effective date of the proposed rent increase for submissions under § 245.315(b) (forward-budget approach).
>
> (b) After HUD has considered the request for an increase in rents, has found that it meets the requirements of § 245.320, and has made its determination to approve, adjust upward or downward, or disapprove the request, *it will furnish the mortgagor with a written statement of the reasons for approval, adjustment upward or downward, or disapproval*. The mortgagor must make the reasons for approval, adjustment, or disapproval known to the tenants, by service of notice on them as provided in § 245.15.

24 C.F.R. § 245.325 (emphasis added).

[6] Section 7-1 of the HUD Handbook provides in relevant part:

> HUD's prime interest is in promoting the efficient management and continued financial viability of its projects. In reviewing requests from owners concerning rents and charges, the [HUD] Field Office should be guided by the fact that these rents and fees should and must provide sufficient and adequate funding to operate the projects.

HUD Handbook 4350.1, REV-1 at 7-1.

[7] Section 7-21 provides in relevant part:

> When current rent levels are NOT sufficient to cover anticipated or unavoidable increases in operating costs, owners should request that HUD approve an increase in rents.

The parties agree that the Regulatory Agreement, the PWA, and the Agreement For Modification of Note and Mortgage ("Modification Agreement") incorporating the terms of the PWA are all contracts. *See* Gov't Reply at 4; *see also Trauma Serv. Group* v. *United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("To show jurisdiction . . . [Plaintiff] must show that either an express or implied-in-fact contract underlies its claim."). Accordingly, the court has jurisdiction to adjudicate Plaintiff's claims that the Government breached the Regulatory Agreement and/or other contractual duties.

Plaintiff, however, also contends that the court has subject matter jurisdiction to adjudicate violations of Section 236 of the National Housing Act, implementing regulations, and agency guidance, because "HUD derives its statutory authority to enter into the [R]egulatory [A]greement and to issue mortgage insurance to owners pursuant to the authority granted to it by the National Housing Act" and "[p]ursuant to that authority, HUD has also issued regulations . . . and published Handbooks[.]" Pl. Resp. at 16. The court does not, however, have jurisdiction over any alleged violations of the aforementioned statute, regulations, and agency guidance, because none provide money-mandating causes of action. *See Mitchell*, 463 U.S. at 216 (holding a plaintiff must demonstrate that the source of substantive law upon which the claim relies "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained"); *Todd*, 386 F.3d at 1094 ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *Roth*, 378 F.3d at 1384 ("Because the Tucker Act itself does not provide a substantive cause of action, . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit."). Neither Section 236 of the National Housing Act, the implementing regulations, nor the agency guidance contain express provisions mandating that a mortgagor receive money damages if HUD fails to consider a rent increase request. Therefore, Plaintiff has the burden of proving that the statute, regulations, and agency guidance are incorporated by reference into the Regulatory Agreement. *See Kennedy Heights Apartments Ltd. I, and Wilshire-Washington Heights, L.P.* v. *United States*, 48 Fed. Cl. 574, 577-78 (2001) (quoting *Nutt* v. *United States*, 12 Cl. Ct. 345, 351 (1987)) ("The federal government may make promises in contracts by including statutory or regulatory language, or by specifically referencing statutes, or regulations, in the provisions of such contracts. 'If the Government then violates those [statutes or] regulations, it may become liable for damages for breach of contract.'").

The first page of the Regulatory Agreement states: "in order to comply with the requirements of Section 236 of the National Housing Act, as amended, and the Regulations adopted by the Commissioner pursuant thereto, Owners agree[.]" Pl. App. at 15. The Government contends that

---

HUD Handbook 4350.1, REV-1 at 7-21.

[8] The HUD Handbook provides that "HUD Field Offices must establish a tracking system that will facilitate and monitor compliance" with timetables set out in the Handbook. HUD Handbook 4350.1, REV-1 at Section 7-25. These rules set a maximum of thirty days for HUD to consider the rent adjustment request. Even where HUD determines that additional information is needed to process the request, requests for such additional information "must be made in writing and within 30 days of receipt of initial [rent adjustment request] package." *Id.* at 7-25 (B) & (D).

"the language is very general and does not impose a duty upon HUD."[9] Gov't Mot. at 26. The court concurs.

Contract interpretation "begins with the plain language of the agreement." *Foley Co.* v. *United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993). In interpreting a contract, the court gives the "'words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternate meaning.'" *Jowett, Inc.* v. *United States*, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (citations omitted). Therefore, "[a]n interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Gould, Inc.* v. *United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (quoting *Arizona* v. *United States*, 575 F.2d 855, 863 (Ct. Cl. 1978)).

The plain language of the Regulatory Agreement incorporates Section 236 duties applicable to Plaintiff, but does not speak of any Section 236 duties applicable to HUD. HUD merely "agreed to make interest reduction payments on [P]laintiff's loan in exchange for [P]laintiff's agreement to abide by the requirements set forth in the [R]egulatory [A]greement." *See Reynolds Assocs.* v. *United States*, 31 Fed. Cl. 335, 340 (1994) (holding HUD handbook was not incorporated into Regulatory Agreement and thus did not bind HUD so that failure to process rent increase request did not leave Government liable). Therefore, HUD's "only obligation was making the interest reduction payments as agreed." *Id.*

Therefore, to the extent that Count One of the Complaint alleges a breach of Section 236 of the National Housing Act, 24 C.F.R. § 236.55(a)(1995) (saved by 236.1(b)(1997)), 24 C.F.R. § 245.325(b), and/or HUD Handbook 4350.1, REV-1 at 7-1, 7-21, 7-25, such claims are dismissed for lack of subject matter jurisdiction.[10]

---

[9] The Government also contends that 24 C.F.R. § Section 245.325(b) was not adopted pursuant to Section 236 of the National Housing Act, but rather was adopted, pursuant to the Housing and Community Development Amendments of 1978, as amended in 12 U.S.C. § 1715z-1b. *See* Gov't Mot. at 27. Therefore, even if the court interprets "Section 236 of the National Housing Act, as amended, and the Regulations adopted by the Commissioner pursuant thereto" to mean such regulations were incorporated by reference to the Regulatory Agreement, 24 C.F.R. § 245.325(b) would not be included. *Id.* Since the court has determined that Section 236 duties applicable to HUD were not incorporated by reference into the Regulatory Agreement, there is no need to reach this issue.

[10] At oral argument, Plaintiff contended that the United States Court of Appeals for the Federal Circuit's decision in *Brighton Village Assocs.* v. *United States*, 52 F.3d 1056 (Fed. Cir.1995) and the United States Court of Federal Claims' decision in *Crest A Apartments Ltd. II.* v. *United States*, 52 Fed. Cl. 607 (2002) require the court to assert jurisdiction over the alleged statutory and regulatory violations in this case. *See* TR 19-21. Unlike the Regulatory Agreement in this case, however, the Housing Assistance Payments (HAP) contracts in *Brighton Village Assocs*. and *Crest A Apartments Ltd. II* incorporated by reference statutory and regulatory duties applicable to HUD.

**2. The Complaint States A Claim Upon Which Relief Can Be Granted.**

The Government argues that Plaintiff is seeking to hold the Government liable for failing to grant the 1997 rent increase request, although "HUD has complete discretion whether to grant or deny a rent increase, and such discretion is unreviewable by this Court." Gov't Mot. at 10-11; Gov't Reply at 6; *see also Reiner* v. *West Village Assocs.*, 768 F.2d 31, 33 (2d Cir. 1985) (holding that both the amount of a prospective rent increase and the decision to grant increases retroactively are committed to HUD's discretion); *Frakes* v. *Pierce*, 700 F.2d 501, 504-06 (9th Cir. 1983) (*quoting Hahn* v. *Gottlieb*, 430 F.2d 1243, 1249-51) (1st Cir. 1970) ("[C]ourts are ill-equipped to superintend economic and managerial decisions of the kind involved here." (internal citations omitted))); *Harlib* v. *Lynn*, 511 F.2d 51, 56 (7th Cir. 1975) ("Again we agree with the First, Second and Third Circuits that Congress did not intend any . . . judicial review of HUD's decision to raise rents"). Therefore, the Government also argues that "HUD'S failure to approve rent increase requests cannot give rise to a breach of contract claim." Gov't Reply at 6.

The Complaint, however, does not allege that the Government breached the contract by failing to approve the 1997 rent increase request, but rather by refusing to consider the request at all. A decision to *consider* a rent increase request, however, is not committed to agency discretion, and is therefore reviewable by this court. *See St. Christopher Village, L.P.* v. *Retsinas,* 190 F.3d 310, 316 (5th Cir. 1999) (quoting *Hahn*, 430 F.2d at 1251) ("a court's refusal ro review HUD rent decisions does not necessarily obtain when HUD [allegedly] ignores 'a plain statutory duty, exceed[s] its jurisdiction, or commit[s] constitutional error.'"). Accordingly, Plaintiff has stated a claim upon which relief can be granted.

**3. Plaintiff's Breach of Contract Claim Is Not Barred By The Statute Of Limitations.**

The Government argues that the court does not have jurisdiction over Plaintiff's breach of contract claim because the statute of limitations has expired. *See* 28 U.S.C. § 2501. According to the Government, Plaintiff's claim accrued on December 21, 1988, when HUD first denied the rent increase request and informed Plaintiff that the denial was based on its failure to make the 1987 workout payment. *See* Gov't Mot. at 48-51; *see also* Gov't App. at 95 (letter from Director of HUD's Housing Management Division, Hartford, Connecticut denying November 1, 1998 rent increase request). The Government also argues that Plaintiff should have known upon receipt of the December 21, 1988 denial that HUD would not consider a rent increase until Plaintiff cured the alleged default. *Id.* at 50-51. Therefore, the Government concludes that Plaintiff could have filed suit on December 21, 1988 and failure to file suit within six years bars the Complaint under the statute of limitations. *Id.* at 51.

---

The HAP contracts provided that "[c]ontract rents and utility allowances shall be adjusted by HUD in accordance with HUD regulations and procedures." 52 Fed. Cl. at 611. Unlike the Regulatory Agreement in this case, the HAP contracts place a duty on HUD to follow its regulations and procedures when adjusting rents.

Plaintiff counters that HUD regulations allow owners to make multiple rent increase requests and each request imposes a separate duty to act on HUD. *See* Pl. Resp. at 20; (citing HUD Handbook 4350.1 REV-1 at sec. 7-21 ("When current rent levels are NOT sufficient to cover anticipated or unavoidable increases in operating costs, owners should request that HUD approve an increase in rents.")). According to Plaintiff, "all the events . . . that fix liability" regarding the 1997 request did not occur until HUD had the ability to consider that particular request. *Id.* at 19-20. Plaintiff insists that HUD could deny one rent increase request, but then grant a subsequent request. *Id.* at 19-21.

The court has determined that Plaintiff's claim arising from the Government's alleged failure to consider Plaintiff's 1997 rent increase request accrued when HUD received the request. *See* Pl. App. at 990-91 (Ms. Verdile testified that she mailed the rent increase request letter on September 25, 1997); *see also Park Village Apartments* v. *United States*, 25 Cl. Ct. 729, 734 (1992) ("Even assuming HUD calculated the rent for one particular year improperly, under the terms of the contract, the next year HUD would be under a separate and distinct obligation to have the new rent not materially different from the rents then charged for comparable unassisted units. *In the event HUD failed to so modify the rents in a particular year, plaintiff had a new cause of action for the violation for that year.*" (emphasis added)). The Government admits that "[o]n September 25, 1997, [the] Regional Manager for the property manager, Housing Solutions, Inc., submitted a rent increase request to . . . HUD[ .]" Gov't Fact ¶ 26; *see also* Gov't Reply at 16. The Government, however, insists that it has "no record" of receiving the letter and none of its employees have knowledge of receiving the letter. Govt' Mot. at 13; *see also* Gov't Fact ¶ 27-29. The United States Supreme Court has held that "proof that a letter properly directed was placed in a post office, creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed." *Hagner* v. *United States*, 285 U.S. 427, 430 (1932); *see also Legille* v. *Dann*, 544 F.2d 1, 4-5 (D.C. Cir. 1976) ("Proof that mail matter is properly addressed, stamped and deposited in an appropriate receptacle has long been accepted as evidence of delivery to the addressee."). Therefore, the Government's statement that it has "no record" of receiving the letter is not sufficient to rebut the presumption of receipt.[11]

Accordingly, Plaintiff's claims arising out of Government's alleged failure to consider Plaintiff's 1997 rent increase request accrued when HUD received the request on or about September 25, 1997. *See Brown Park Estates-Fairfield Dev. Co.*, 127 F.3d at 1455. Therefore, the statute of limitations had not run on September 24, 2003, when Plaintiff filed the Complaint in the United States Court of Federal Claims and Plaintiff's breach of contract claim is not time-barred. *See* 28 U.S.C. § 2501.

---

[11] This case is distinguishable from *Crest A Apartment Ltd. II*, where the court held that the parties' dispute over submission of rent increase requests constituted a genuine issue of material fact. *See* 52 Fed. Cl. 607 at 612. In this case, both parties agree that the 1997 rent request was submitted.

### D. The Court's Resolution Of Government's April 19, 2006 Motion For Summary Judgment And Plaintiff's May 30, 2006 Cross-Motion For Partial Summary Judgment.

#### 1. The Government Did Not Breach The Express Provisions Of The Regulatory Agreement.

The Complaint alleges that the Government's failure to consider Plaintiff's 1997 rent increase request breached Paragraphs 4(a) and 4(1) of the Regulatory Agreement. *See* Compl. ¶ 14. The Government denies any breach. *See* Gov't Mot. at 19-20.

The Regulatory Agreement sets forth the process for establishment, approval, and adjustment of rental rates. Paragraph 4(a) provides:

> with the prior approval of the [Federal Housing] Commissioner, [the owners] will establish for each dwelling unit (1) a basic rental charge determined on the basis of operating the project with payments of principal and interest under a mortgage bearing interest at one percent and (2) a fair market rental charge determined on the basis of operating the project with payments of principal, interest and mortgage insurance premiums due under the insured mortgage on the project[.]

Gov't App. at 1.

Paragraph 4(1) provides:

> no change will be made in the basic rental or fair market rental unless approved by the Commissioner[.]

*Id*. at 2.

Neither of these provisions place a duty on HUD. Accordingly, HUD did not breach any of the express provisions of the Regulatory Agreement. Instead, Paragraph 4(a) sets forth Plaintiff's duty to establish a basic rental charge and a fair market rental charge and to then acquire the Commissioner's approval. In addition, Paragraph 4(1) states that no change can be made in the basic rental and fair market rentals established, pursuant to Paragraph 4(a), unless the Commissioner approves the change.

Plaintiff's argument relies on the operation of the Regulatory Agreement with statutory and regulatory duties. *See* Pl. Resp. at 24-29 (citing *Christopher Village L.P.*, v. *Retsinas*, 190 F.3d at 319) (Fifth Circuit case holding that "HUD acted arbitrarily and capriciously when it refused to abide by its . . . [contractual, statutory, and regulatory duty] to consider a rent increase request from a non-negligent owner."). Central to the United States Court of Appeals for the Fifth Circuit's analysis, however, is HUD's violation of statutory and regulatory duties, over which this court does not have jurisdiction. *Id.* at 317-19. Moreover, the Regulatory Agreement at issue in *Retsinas* expressly stated that HUD "will at any time entertain a written request for [a rent] increase." *Id.* at 316.

Furthermore, when the plaintiff in *Retsinas* brought a related suit in the United States Court of Federal Claims, on appeal, the United States Court of Appeals for the Federal Circuit held that United States District Courts do not have jurisdiction "to issue a declaratory judgment as to the [G]overnment's liability for breach of contract solely in order to create a 'predicate' for suit to recover damages in the Court of Federal Claims." *See St. Christopher Village, L.P.* v. *United States*, 360 F.3d 1319, 1321 (Fed. Cir. 2004). Although the United States Court of Appeals for the Federal Circuit affirmed on other grounds, it stated " we doubt the correctness of the Fifth Circuit's decision that the [G]overnment breached in refusing to consider the appellant's rent increase request." *Id.* at 1333. For this additional reason, the court has determined that the Government did not breach the Regulatory Agreement.

**2. The Complaint Does Not Allege A Cognizable Taking Claim.**

Count Two of the Complaint alleges that the Government's failure to consider the 1997 rent increase request decreased Plaintiff's revenue and return from the Property, which was a taking of private property without just compensation. *See* Compl. ¶ 40-42; *see also* U.S. CONST. amend. V ("Nor shall private property be taken for public use, without just compensation[.]").

The Government insists that because HUD acted in a commercial capacity when entering into the Regulatory Agreement, Plaintiff's remedy is through contract, not takings law. *See* Gov't Mot. at 44-48 (citing *Hughes Commc'ns Galaxy, Inc.* v. *United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2002) (quoting *Sun Oil Co.* v. *United States*, 572 F.2d 786, 818 (Ct. Cl. 1978) (citations omitted) ("'[T]he concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim.'")).

Plaintiff concedes that interference with contractual rights usually gives rise to a breach of contract claim, but notes that "rights existing independently of a contract . . .may be pursued through a takings action." Pl. Resp. at 46 (citing *Integrated Logistics Support Sys. Int'l* v. *United States,* 42 Fed. Cl. 30 (1998)). Accordingly, Plaintiff makes an alternative claim that if the court determines that the Government had no contractual obligation to consider the rent increase request, then Plaintiff's rights exist independent of the contract, resulting in a cognizable takings claim. *Id.*

The Government responds that Plaintiff's right to consideration of a rent increase request "did not exist independently of the Regulatory Agreement," because "[Plaintiff] could not raise rent without HUD approval." *See* Gov't. Reply at 24 (citing Gov't App. 2 at ¶ 4(1)). The court concurs.

Plaintiff made a business decision to utilize the Section 236 program to receive a HUD low-interest loan. *See* Gov't App. at 1-10; Pl. App. at 15-20, 53-56. Before entering into the Regulatory Agreement, Plaintiff had the opportunity to negotiate with the Government to change the rent increase process, but instead accepted the Government's terms. The Regulatory Agreement places many duties on Plaintiff and only one on the Government, but Plaintiff, a for-profit limited partnership, voluntarily agreed to those terms. *See* Gov't App. at 1-6; Pl. App. at 15-20.

The proper analysis for determining whether a claim is to be adjudicated with reference to contract law, as opposed to takings law, is not whether a specific duty is incorporated into a contract, but whether "the Government act[ed] in its commercial or proprietary capacity . . . rather than in its sovereign capacity." *Hughes Commc'ns Galaxy, Inc.*, 271 F.3d at 1070. The court has determined that no statutory and/or regulatory duty to consider the rent increase request was incorporated into the Regulatory Agreement. Nonetheless, any such duty, whether incorporated into the Regulatory Agreement or not, would only be applicable to HUD's commercial dealings with Section 236 owners. In considering or failing to consider an owner's rent increase request, the Government was not acting as a sovereign regulator, but as a commercial partner. *See Hughes Comm'ns Galaxy, Inc.*, 271 F.3d at 1070. Therefore, Plaintiff's only remedy in this forum is through contract law.

Assuming, *arguendo*, that Plaintiff's sole remedy was constitutional, in this case, the Complaint did not allege a cognizable regulatory taking, because there is no claim that HUD imposed a new regulatory scheme or took any regulatory action, but instead failed to follow regulations already in place.[12] It is true that an agency's violation of its own regulations, under some circumstances, may give rise to a Fifth Amendment Due Process Clause claim. *See Prevado Village PSHP* v. *United States*, 3 Cl. Ct. 219, 229 (1983). The United States Court of Federal Claims, however, does not have jurisdiction to adjudicate such claims. *Id.* ("The expectancy of procedural due process is not, in and of itself, an independent property right capable of being taken by the government for public use. [T]his court lacks jurisdiction over Due Process Clause claims because such claims do not involve the awarding of money damages.").

## IV. CONCLUSION.

For these reasons, the Government's April 19, 2006 Motion to Dismiss is denied to the extent that Count One of the Complaint alleges breach of the Regulatory Agreement and granted to the extent that Count One alleges a violation of Section 236 of the National Housing Act, 24 C.F.R. § 236.55(a)(1995) (saved by 236.1(b) (1997)), 24 C.F.R. § 245.325(b), and HUD Handbook 4350.1, REV-1 at 7-1, 7-21, 7-25. The Government's April 19, 2006 Motion for Summary Judgment is granted. Plaintiff's May 30, 2006 Cross-Motion for Partial Summary Judgment is denied.

The Clerk of the Court is directed to enter final judgment in favor of the Government.

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

---

[12] Unlike the case at bar, in *Cienega Gardens* v. *United States*, 331 F.3d 1319 (Fed Cir. 2003), Congress passed a law that prohibited the prepayment of mortgages without HUD approval, nullifying regulations in place at the time the owners entered into the regulatory agreements that had allowed this practice. *Id.* at 1325-26 (The United States Court of Appeals for the Federal Circuit overruled the United States Court of Federal Claims' holding that the plaintiff had not established a cognizable regulatory taking).